**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

WANDA RIVERA GARCÍA,

Plaintiff

v.                                                    CIV. NO. 09-1813 (PG)

SPRINT PCS CARIBE, PATRICIA EAVES,
JUAN O. RODRÍGUEZ, and EVELYN
DÁVILA,

Defendants.

## OPINION AND ORDER

Plaintiff Wanda Rivera-García ("Rivera" or "Plaintiff") has brought this action under Title VII of the Civil Rights Act against her employer, Sprint PCS Caribe ("Sprint") as well as several of her supervisors, namely Patricia Eaves, Juan Rodríguez, and Evelyn Dávila (hereinafter collectively referred to as "Defendants").[1] In her complaint, Rivera states that Defendants discriminated against her because of her gender, sexually harassed her, subjected her to a hostile work environment, and unlawfully terminated her employment in retaliation for her opposition to said conduct. Docket No. 1. Defendants now move for summary judgment, arguing that the allegations set forth by Rivera, as well as the evidence on the record, do not sustain any of her claims. Docket No. 83. Rivera has opposed Defendants' request, Defendants have filed their reply and Rivera has responded with a sur-reply. Dockets No. 100, 130 and 138, respectively. For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' request for summary judgment.

## I.    Background
### A. Procedural Background

On August 17, 2009 Rivera filed the instant action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

---

[1] Rivera also brings claims under Puerto Rico Laws Nos. 17 of April 22, 1988 (sexual harassment); No. 100 of June 30, 1959 (discrimination); No. 69 of June 6, 1985 (gender discrimination); No. 115 of December 20, 1991 (retaliation); No. 80 (wrongful termination) and article 1802 of the Puerto Rico Civil Code. The Court previously dismissed Rivera's art. 1802 claim with prejudice. Docket No. 36.

Civil No. 09-1813 (PG)                                                   Page 2

(Title VII); the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a and 1988;
Puerto Rico Law No. 17 of April 22, 1988, P.R. LAWS ANN. tit. 29, § 155,
*et seq.* ("Law 17"); Puerto Rico Law No. 100 of June 30, 1959, P.R. LAWS
ANN. tit. 29, § 146, *et seq.* ("Law 100"); Puerto Rico Law No. 69 of July
6, 1985, P.R. LAWS ANN. tit. 29, § 1321, *et seq.* ("Law 69"); Puerto Rico
Law No. 115 of December 20, 1991, P.R. LAWS ANN. tit. 29, § 194, *et seq.*
("Law 115"); Puerto Rico Law No. 80 of May 30, 1976, P.R. LAWS ANN. tit.
29, § 185a, *et seq.* ("Law 80"); and Article 1802 of the Puerto Rico Civil
Code. See Compl., Docket No. 1. In her complaint, Rivera states that
Defendants discriminated against her because of her gender, sexually
harassed her, subjected her to a hostile work environment, and unlawfully
terminated her employment in retaliation for her opposition to the
alleged misconduct.

Defendants answered the complaint on October 16, 2009 and basically
denied most of Rivera's averments. Docket No. 6. They subsequently filed
several motions to dismiss and motions for judgment on the pleadings
seeking dismissal of several of Rivera's claims. See Dockets No. 11, 19
and 24. Rivera also entered a motion requesting the voluntary dismissal
of the claims against certain co-defendants, as well as a motion for
partial voluntary dismissal without prejudice. See Dockets No. 12 and 22,
respectively. On August 9, 2010 the Court issued an amended opinion and
order whereby it: (1) dismissed with prejudice Rivera's claims against
co-defendant Efrén Pagán and Conjugal Partnership Pagán-Eaves; (2)
dismissed with prejudice Rivera's Title VII and Law 80 claims against co-
defendants Eaves, Dávila and Rodríguez; (3) dismissed with prejudice
Rivera's article 1802 claim; and (4) dismissed without prejudice Rivera's
claims against co-defendants Conjugal Partnerships Rodríguez-Castillo and
Vélez-Dávila. Docket No. 36. Consequently, Rivera's claims under Title
VII and Puerto Rico Laws No. 17, 69, 80, 100 and 115 against Sprint and
her claims under Puerto Rico Laws No. 17, 69, 100 and 115 against Eaves,
Rodríguez and Dávila remained before the Court.

On April 15, 2011 Sprint filed the motion for summary judgment
currently before the Court. Docket No. 83. Rivera followed by filing her
opposition, to which Defendants replied, and Rivera then sur-replied.
Dockets No. 100, 130 and 138, respectively. The parties have also filed a
number of ancillary motions to the motion for summary judgment. The first

motion is a motion in limine filed by Rivera, which seeks to strike several of Defendants' statements of uncontested material facts as they are allegedly supported by unauthenticated attachments that contain inadmissible hearsay statements. Docket No. 103. Defendants opposed her request, arguing that the attachments in question are admissible as an exception to the hearsay exclusionary rule via the "records of a regularly conducted activity" exception. Docket. No. 118.

The second motion is one filed by Defendants entitled "Motion to Strike Plaintiff's Sham Unsworn Statement Under Penalty of Perjury," which seeks to strike a statement filed by Rivera under the argument that it contradicts Rivera's earlier deposition testimony and is merely a "sham" to defeat Defendants' motion for summary judgment. Docket No. 117. Rivera signed the statement after Defendants filed their motion for summary judgment, and has employed it to oppose Defendants' statement of uncontested material facts. Rivera now opposes Defendants' motion to strike and Defendants have replied. Dockets No. 121 and 128.

The last motion is a motion to strike a Log of Events, whereby Rivera requests this Court to strike a compilation of notes prepared by her during her tenure with Sprint, under the argument that Defendants' did not timely include them in the record. See Docket No. 121.

The Court will proceed to briefly discuss and dispose of these motions below.

### i.    *Rivera's Motion in Limine (Docket No. 103)*

Rivera claims that several of Defendants' statements of uncontested material facts are unsupported by admissible evidence. According to her, several of the documents employed by Defendants to sustain said statements are inadmissible under the Federal Rules of Evidence as they are either hearsay, unauthenticated, unsigned, not backed by an affidavit of the alleged declarant, or in some cases, all of the above. Specifically, Rivera requests the Court to exclude the following statements from Defendants' statement of uncontested material facts: 40, 41, 46, 49, 51, 67, 69, 89, 90, 91 and 106. These are supported by documents classified as: attachments 13 to 20, 24 and 25, 27 to 37, 44 and 53 to 59 to Exhibit A of Defendants' statement. Docket No. 82. Defendants note that all of these documents are either summaries of

interviews conducted with employees under Rivera's supervision, complaints against Rivera sent by Sprint customers, or declarations obtained by Sprint of the employees under Rodríguez's (the alleged harasser's) supervision regarding the investigation that ensued after Rivera's sexual harassment complaint.

Upon browsing the relevant documents, it appears to the Court that many of them are indeed hearsay. Hearsay is defined as any statement that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The well-known exclusionary rule deems hearsay to be inadmissible unless one of the prescribed exceptions applies. Fed. R. Evid. 802. At first glance, it would appear that many of the challenged documents constitute hearsay within hearsay because they contain multiple statements. Taking as an example the notes prepared by Dávila (Sprint's Human Resources Manager) during her interviews with Sprint employees, those notes contain: (1) statements by the interviewed employee given in response to Dávila's questions; and (2) Dávila's own statement as engendered in the notes themselves, which purport to assert that their content is a truthful reflection of what was indeed said during those interviews. The Court concludes, however, that only the second statement is hearsay, while the first one is not, as it is not being brought to prove the truth of its contents.

In cases such as this one, where an employer seeks to justify an employee's dismissal by alluding to the employee's abusive behavior towards her subordinates, the issue is not whether such behavior actually took place, but rather whether the employer's decisionmakers reasonably believed that it took place. Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 674 (1st Cir. 1996). It is to this end that Sprint brings the statements made against Rivera by her subordinates and customers. These statements, Sprint argues, are not being brought to establish the veracity of such, but rather to document that as part of its disciplinary procedures, its management and Human Resources Department performed investigations, gathered relevant information and made determinations based on the evaluation of the information collected. Interview notes such as the ones being impugned by Rivera are not hearsay because their

real purpose is to establish that Sprint had a reasonable basis for taking the disciplinary measures it took against Rivera, measures which eventually led to her termination. As such, those statements are not subject to the hearsay exclusionary rule and this Court may consider them.

As to the second statement which is comprised of the interview notes taken by Dávila, the Court is of the opinion that the same squarely fall within the "records of a regularly conducted activity" exception. Fed. R. Evid. 803(6). Under this exception, the records are admissible if they: (1) were made at or near the time by (or from information transmitted by) someone with knowledge; (2) were kept in the course of a regularly conducted activity of a business; (3) making the records was a regular practice of that activity; (4) all these conditions are shown by the testimony of the custodian; and (5) neither the source of the information nor the methods or circumstances of preparation indicate a lack of trustworthiness. Sprint has provided an unsworn statement under penalty of perjury by the custodian of the challenged records, Dávila, who also happens to be the person who authored most of them. Docket No. 118, Exh. A. The unsworn statement clearly indicates that all of the conditions prescribed by Rule 803(6) have been met, and it stresses that Sprint's Human Resources Department regularly and continuously investigates and collects pertinent information related to the labor history and performance of its personnel, including Rivera. Thus, the documents being attacked by Rivera's motion in limine are admissible.

Rivera does, however, advance a valid point as to the authentication of several of the documents being proffered by Sprint. The Court observes that several of these are unsigned, and as such cannot be authenticated under Fed. R. Evid. 901(a). Said Rule states that in order to "satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Several of the documents presented by Sprint exhibit no signature, either by Dávila or by the person who made the underlying statement. As such, Sprint has not met its burden of proving that those documents are what it claims they are. Accordingly, the following documents are stricken from the record: attachments 13, 31, 32, 34, 37, 54(b), 56, 58 and 59 of Exhibit A of

Sprint's statement.

Finally, Rivera also requests this Court strike several extracts from the results of a personality test administered to her by her own expert witness, under the argument that the same have not been properly authenticated by such psychologist. The Court rejects this claim as it is apparent that psychologist Ramos Duchateau, who conducted said test, certified the authenticity of the same during her deposition. Accordingly, the Court declines Rivera's invitation to strike said extracts at this stage of the proceedings.

Rivera's motion in limine is therefore **GRANTED** in part and **DENIED** in part.

### ii.   *Sprint's Motion to Strike Sham Statement (Docket No. 117)*

As part of her opposition to Sprint's motion for summary judgment, Rivera included an unsworn declaration under penalty of perjury ("Rivera's Statement"). Docket No. 101, Exh. 1. Defendants call for this statement be stricken as it includes averments that "directly contradict or are clearly inconsistent with previous statements given under oath by Plaintiff or reaffirmed as true and correct by her under oath without any justification for said changes." Specifically, Sprint requests that paragraphs 8, 11, 19, 23, 24, 28, 29, 35, 37, 47 and 65 of Rivera's Statement be stricken by this Court, based on the "sham affidavit doctrine."

At the outset, the Court notes that Rivera's Statement was signed after the Defendants' motion for summary judgment had been filed, which itself suggests to the Court "that the Statement was made solely to create an issue of fact for the purpose of surviving summary judgment." Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006) (holding district court did not abuse discretion in disregarding affidavit submitted in support of plaintiff's opposition to summary judgment, since statements therein conflicted with answers plaintiff had given in her deposition, and plaintiff failed to provide satisfactory explanation for subsequent change in testimony). "It is settled that '[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.'" Torres

v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000) (citing Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994)).

The Court is forced to agree with Defendants that several of the averments contained in Rivera's Statement are contradictory, incongruent and simply cannot be sustained by the available evidence situated on the record. In particular, in her Statement Rivera alleges that Rodríguez's sexually-charged conduct towards her can be traced as far back as 2004, and that she began informing Human Resources of the same in 2005. However, unblemished evidence from the record points to the contrary. In documents authored by Rivera herself, including a "Log of Events"[2] and a report written by her in 2007 as per Sprint's request, Rivera categorically stated that Rodríguez's lewd comments began for the first time on July 2007, and that it was in the following months that she began attempting to inform Sprint of the same. Taking into account that Rivera's Statement was executed on June 15, 2011, that is after Sprint filed its motion for summary judgment, the Court must conclude that the same was an attempt by Rivera shore up her hostile work environment case and concoct issues of material facts where none exist. Hence, any references in the Statement that portray Rodríguez as having sexually harassed Rivera before July 2007 merit being stricken from the record. Moreover, even if the Court were to allow those statements to stand, the same are generic and conclusory and cannot survive a properly-supported motion for summary judgment.[3] See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261 (1st Cir. 1999).

As a result, the Court hereby strikes from Rivera's Statement paragraphs no. 8, 19, 23, 24, 28 (first sentence only) and 65. Sprint's motion to strike Rivera's "sham" statement is therefore **GRANTED** in part and **DENIED** in part.

### iii. Rivera's Motion to Strike Log of Events (Docket No. 121)

---

[2] The "Log of Events" was a document prepared by Rivera during her tenure with Sprint, where she (sometimes contemporaneously) describes many of the events related in her Complaint. See Docket No. 117, Exh. A, Attachment 1. During one of her depositions, Rivera, under oath, ratified as true the contents of said Log. See id.
[3] A statement such as "[a]lthough Rodríguez was married he began a pattern of sexual harassment consisting of sexual advances and innuendos" without further elaboration, is clearly generic and conclusory.

Rivera has also filed a motion requesting this Court to strike the aforementioned Log of Events, under the argument that Defendants did not refer to it in support of their motion for summary judgment. Docket No. 121. Defendants had referred to the Log of Events in their Reply to Rivera's opposition to their motion for summary judgment, prompting Rivera's objection that the same was being brought "through the back door." Rivera argues that said Log of Events is "nothing more than raw notes prepared by her pursuant to her attorney's instructions, in anticipation of the instant litigation." Defendants counter that this Court should nevertheless consider the Log of Events as it reveals that Rivera´s Statement contains "serious inconsistencies," which they argue requires several of the statements contained therein to be defenestrated. See Docket No. 126.

The Court is inclined to agree with Defendants, who point out that while Local Rule 7(c) states that a reply should only address new matters brought up in the opposition by the non-movant, it clearly does not inhibit a movant from referencing any admissible evidence in their reply, as long as it is necessary to respond to a new matter raised in the opposition. The Court notes that Rivera's Statement was signed on June 15, 2011, that is two months after Defendants filed their motion for summary judgment. Rivera's opposition to that motion extensively relies on said Statement in an attempt to establish a genuine dispute as to several material facts. Thus, Defendants have proffered a legitimate basis for referencing the Log of Events in their Reply to Rivera's opposition, and the Court is entitled to consider it.

Accordingly, Rivera's motion to strike the Log of Events is **DENIED**.

## B. Findings of Fact

The Court makes the following relevant findings of fact based on the Defendants' statement of uncontested material facts and Plaintiff's opposition thereto (Dockets No. 82 and 101) as well as Plaintiff's counterstatement of material facts and Defendants' opposition thereto (Docket No. 102 and 115). In addition, the Court includes herein any material facts which have not been genuinely opposed.

Rivera began working for Sprint on September 17, 2001 as a Retail Store Supervisor. When she began working there she was provided with a

copy of several of Sprint's employment policies, including a copy of Sprint's Anti Sexual Harassment Policy, which she acknowledged receiving.

On June 16, 2002 Rivera was promoted to the position of Store Manager, and remained at such position until the time of her dismissal. As a store manager, she had direct responsibility for the operation of the particular Sprint stores to which she was assigned from time to time. Her duties included managing and training store personnel, guaranteeing compliance with all of Sprint's policies and procedures, as well as maintaining the overall quality of the services provided by the store to its customers.

According to Rivera, she always performed her duties above target, and was the recipient of several awards and commendations for her performance while working as a Store Manager.

During her employment with Sprint, Rivera received several trainings regarding Sprint's anti-harassment policies and procedures, as well as the Employee Guidelines and Ethics Code, although the parties are in dispute as to the frequency of these trainings.

As a Store Manager, Rivera had to implement and advise her subordinates about Sprint's anti-sexual harassment policy.[4] Rivera was also duly trained by Sprint to handle sexual harassment complaints, and was responsible for channeling to the Human Resources Department any such grievances pursuant to the aforementioned policies. She admits to having knowledge about all of Sprint's policies, including the "zero tolerance policy" towards sexual harassment, which was in force at all pertinent times related to Rivera's complaint.[5]

Sprint has a Code of Conduct where it emphasizes the need for employees to treat each other with dignity and respect. This Code also states the following in its Harassment and Related Issues Section:

> Every employee has a right to a work environment which is free from harassment regardless of whether the harasser is a co-worker,

---

[4] Plaintiff argues that the fact that Sprint had these policies in place does not necessarily mean that Defendants followed them.

[5] This policy prohibits employees from engaging in any kind of offensive, sexually charged conduct and requires employees to immediately notify said behavior if indeed suffered or witnessed by them. It also provides several alternatives for employees to inform or complain about prohibited conduct, including an open door policy and a 24 hour confidential telephone line known as the Ethics Helpline. Although she knew of the Helpline, Rivera claims she was reluctant to use it as she thought her complaints would eventually reach her supervisors.

> supervisor, manager, customer or visitor. Harassment can include any behavior (verbal, visual, or physical) that creates an intimidating, offensive, abusive or hostile work environment.

Docket No. 82, Exh. A, Attachment 6. In its section regarding "Expectations of Sprint Associates and Management," Sprint's Customer Satisfaction Principles requires employees to treat customers professionally and establishes that being rude or discourteous is never allowed and the company's primary competitive strategy is to listen and solve the customer's problem. Docket No. 82, Exh. A, Attachment 7.

On August 19, 2002 Sprint received a letter from one of its corporate clients complaining about the treatment received from Rivera when said client arrived at the Sprint store where Rivera worked and requested a replacement phone. The letter stated that Rivera kept the client waiting for an hour and a half, refused to furnish the replacement phone, and told the client that she could not waste any more time with him.[6]

On October 30, 2003 Rivera received a letter detailing several policy violations discovered by an audit carried out at the Sprint store where she worked at the time.[7] Sprint claims that Rivera was placed on a six month written warning as a result, although the record contains no evidence of this other than an unsworn statement under penalty of perjury by Dávila. In a later interview, though, Rivera seemed to admit that she had a warning for an audit.[8]

On or about January 2004, co-defendant Juan Rodríguez became Retail Sales Manager for Sprint Caribe and Rivera's direct supervisor.

On February 17, 2004 Rivera received a "Written Warning" from Rodríguez, describing an incident where Rivera left her store without the proper and authorized management personnel in charge, and breached Sprint's security policy by sharing one of her passwords with another employee.

Rodríguez sent another letter to Rivera on March 29, 2004

---

[6] Sprint did not submit any evidence reflecting Rivera's receipt of this complaint, and Rivera claims that the complaint is too far removed from her dismissal in 2008 to be taken into account as a reason for said dismissal.

[7] The Plaza Escorial Store.

[8] See Dkt. 82, Exh. A. Attachment 22, p. 2. Rivera alleges that this was the first audit she participated in while employed at Sprint, and that the audit revealed several deficiencies that had not been addressed for years prior to her working with Sprint.

indicating that the Human Resources Department and he had received several complaints from Rivera's subordinates alleging mistreatment by Rivera. As a result of the complaints, the letter states, an investigation was carried out, which concluded that the complaining employees were not treated in a professional manner by Rivera, that customers were also not treated in a professional manner, that Rivera lacked understanding regarding the employee's personal issues, and that there existed a communication barrier between the employees and her. Consequently, Rodríguez placed Rivera on a six month written warning.

On June 6, 2004, Rivera acknowledged receipt of the Employee Resources Guide, a revised document that provides employees information about Human Resource policies, practices, programs and benefits as well as the Customer Satisfaction Policy at Sprint.

By August, 2004 Rivera claims that she called Dávila to request an appointment regarding Rodríguez's behavior towards her. During this telephone call, Dávila told her that she was unable to meet with her in person, but that Rivera should let her know what the problem was. Rivera confided in Dávila, who told her not to pay any attention to Rodríguez and just focus on doing her job well.[9]

Rodríguez was apparently informed about Rivera's complaint against him, berated her for it, and ordered her to take two weeks' vacation time. Afterwards, Rodríguez transferred Rivera to the Fajardo Store, which was further away from her home. The Fajardo Store apparently had no running water or electricity, and the employees were required to gather water from the parking lot in buckets to flush the toilets. The store also had very little security and was apparently almost broken into by an unidentified man at some point.

On March 9, 2005, after Rivera began her work at the Fajardo Store, several of the employees there sent an e-mail to Dávila complaining about certain "irregularities" surrounding Rivera's conduct and expressing that as a result, they felt harassed and cohibited from carrying out their affairs. Rivera claims that neither Dávila nor Rodríguez ever informed her about the exact nature of the complaints, and therefore she never had an opportunity to address them.

---

[9] It is unclear to the Court exactly what was said during said conversation.

Several days later, on March 16 and 17, 2005 Rivera was interviewed by Dávila and asked about the complaints that had been filed against her. Although she acknowledged that some of her employees had complained about her, she denied their allegations and mentioned that the real cause of their grievances were the precarious conditions present at the Fajardo store.[10]

Rivera was interviewed a second time on March 17, 2005 where she alleged being subjected to heavy work pressure by Rodríguez. A transcript of the interview does not mention that Rivera ever complained of any sexually inappropriate conduct by Rodríguez. See Docket No. 82, Exh. A, Attachment 21. Sprint claims that Rivera only mentioned that Rodríguez had relocated her to the Fajardo store because she had called Human Resources to "notify his lack of respect towards [her] and the lack of help."[11]

At this time, Rivera claims that her stress levels were so high that she developed cervical spasms and costochondritis, which required staying at home to rest, but that Rodríguez barred her from taking sick leave.

As a result of the investigation brought on by the complaints filed by the Fajardo Store employees, on March 29, 2005 Rivera was given a Final Written Warning by Rodríguez. The letter stated that:

> Specifically an investigation of your management practices revealed numerous issues with your team interactions, management style, and time keeping practices of your store. In addition, there is an overwhelming perception that you would retaliate against your team members for sharing their concerns… it is Sprint's expectation that you will no longer engage in behavior that violates Sprint policy.

Docket No. 82, Exh. A, Attachment 23.

Rivera was given another written final warning on November 2, 2005 and was handed a copy of Sprint's Equal Employment Opportunity Policy by Rodríguez. The letter stated that Sprint had received a claim by Guardsmark (a company that provided Sprint with security guards for their stores) indicating that Rivera had made sexually discriminatory comments

---

[10] Plaintiff mentioned in the interview that the employees were upset because they had been working for the past seven months without electricity or water at the Fajardo store, and that this was impinging on their ability to meet their sales quotas and receive their commissions.

[11] Rivera claims that Dávila failed to include her sexual harassment claims in the transcript of the interview, and that she signed the transcript of the interview out of fear.

about their female guards. The letter also accused Rivera of threatening a Mr. Enrique Parés with contacting Guardsmark's General Manager if he did not replace certain guards.

On April 1, 2005, Sprint received a complaint against Rivera from a customer who alleged that he was mistreated by Rivera and that she made unauthorized transactions with said customers credit card. Rivera admits that Sprint received the letter and that the same was directed to her as a manager, but that the transaction in question was effectuated by another employee.[12]

On June 6, 2005 another customer who was allegedly mistreated by Rivera formally complained against her for her "rude, curt, evasive, and arrogant" behavior.

On or about July 2005, Rivera was transferred to the San Patricio Store. By the end of November 2005, a couple of the employees working there also complained about Rivera's hostile behavior towards them and other employees. See Docket No. 82, Exh. A, Attachments 33 and 36.

Rivera met with Dávila on December 8, 2005 regarding the complaints received from the San Patricio Store employees, and denied having mistreated her subordinates.

Dávila addressed Rivera's purported attitude problems in a memorandum dated January 12, 2006. In said memorandum Rivera was admonished and advised of the possibility of being dismissed if such conduct was not permanently corrected. Rivera was admonished because of her attitude during an interview held on December 8, 2005, in which she allegedly did not offer a constructive disposition towards improving her management style, but rather expressed resentment over the comments made against her by her subordinates. Rivera was also informed about the importance of treating others courteously and with human dignity and the hostile environment her subordinates felt she had subjected them to. Dávila sent Rivera a follow up communication on December 29, 2005 regarding the corrective action plan requested in the memorandum. Rivera sent her corrective action plan on January 16, 2006.

In 2007, Rivera was transferred to the Sprint Store at the Escorial Plaza Shopping Center. Shortly thereafter, Raul Franco, an employee at

---

[12] However, the letter by the customer specifically states that Rivera carried out the referenced transactions. Rivera also does not deny the part of the letter where the customer complains of mistreatment by her.

Civil No. 09-1813 (PG)                                                Page 14

the store, complained to the Sprint Ethics Helpline[13] about mistreatment by Rivera, indicating that Rivera "yells and screams" at the employees in a rude manner.

Another employee at the store, Alivette Hernández, filed a complaint before the Anti-Discrimination Unit of the Puerto Rico Department of Labor for alleged discrimination by Rivera based on race, although she later withdrew her complaint and no disciplinary action was taken against Rivera as a result of that complaint.

During such period of time, Sprint's General Manager, Patricia Eaves, personally met with several employees of the Escorial Store, to investigate, among other things, Rivera's performance as a manager.

On July 3, 2007 Rivera returned to work after taking a vacation at the Dominican Republic. At some point during the day, Rivera was on the phone with Rodríguez talking about work-related matters, when Rodríguez told her laughing that she was "crazy" to go to Santo Domingo to pay for a "dick without social security," and asked her why she was "in such a need".[14] Rivera allegedly felt humiliated by the incident, but failed to report it out of fear for her job. She does claim that she commented the occurrence with the Store Manager at the time, Paul Squitierri, and also with Ana Franco, who was another District Regional Manager, although they both have filed unsworn declarations under penalty of perjury denying ever having knowledge of this incident.

On August 16, 2007 Rodríguez visited the El Escorial Store, and repeated the above comments to Rivera. He also used offensive language to ask Rivera to find him a woman who would have a one night stand with him.[15] Rivera was again humiliated and rebuffed Rodríguez, but he just laughed. Rivera again told Franco about this new incident.

A month later, on September 7, 2007 Rodríguez took his corporate cellphone and told Rivera: "See how beautiful?" Thinking that Rodríguez was going to show her something work related, Rivera looked at

---

[13] The Sprint Ethics Helpline is a toll-free telephone number available 24 hours a day, seven days a week, that any Sprint employee can call when they are faced with any ethics issue.

[14] From the record the Court gathers that Rivera may have had a relationship with someone from the Dominican Republic, and that Rodríguez's comment was meant to ridicule her for it.

[15] Rodríguez´s words were more offensive, he allegedly asked Rivera to "find him a magician who would fuck him and then disappear to hell" ("*encontrarme una maga que eche un polvo y se desaparezca pa'l carajo*").

Civil No. 09-1813 (PG)                                          Page 15

Rodríguez's phone and saw a woman wearing a "white baby doll". Rodríguez then asked Rivera if she had any pictures like that or without any clothes, or whether she had any videos of her having sexual relations. Rivera told him that his conduct was unacceptable and that it had to stop. Rodríguez responded by shouting to all of the employees and issued all of them a verbal "written" warning, which would stay in the employee's records for six months.

On September 29, 2007 Rivera called Eaves at her corporate cellphone to report Rodríguez's conduct, but was only able to leave a message.[16] Eaves apparently forwarded the message to Rodríguez who called Rivera and asked her why she wanted to speak with Eaves and not with him, and also mentioned that he counted on Eaves' support. Rivera told Rodríguez that she was not feeling well and that she did not want to talk with him, and hung up.

Rodríguez then decided to transfer Rivera back to the Fajardo store, effective October 1, 2007. Rivera claims this was in retaliation for opposing his inappropriate remarks.

On Thursday, October 5, 2007 Rodríguez called Rivera to a meeting at "El Mesón" Restaurant to which he indicated in a threatening manner that he was "disappointed" in her, that he never would have believed that she would dare call Eaves. He boasted that Eaves was aware and had signed off on Rivera's transfer to the Fajardo store, and that he had free reign to make any personnel changes he wanted. Rivera asked why he was punishing her because there was no valid reason for the transfer to the Fajardo store, to which Rodríguez told her that he was going to be a "son of a bitch" ("*hijo de puta*") and whoever did not like it that they knew what to do (implying they resign).

As a result, Rivera attempted to avoid being alone with Rodríguez as much as possible, but in each of the few encounters he was extremely hostile to her.

By the end of November 2007, Dávila and Rodríguez conducted several interviews of Fajardo Store employees Melvin Suárez, Laurie Iglesias, Omar Cotto and Sheila Rivera regarding Rivera's conduct. Most of the employees thought that Rivera was a strict manager, but clarified that they had not felt offended by her. One of the employees interviewed,

--------------------------------------------------------

[16] It is unclear to the Court exactly what Rivera said on the message.

Suárez, did complain and expressed feeling offended and disrespected by Rivera, as well as being subjected to a hostile work environment.

Assistant Store Manager Ahiram Aponte sent Eaves and Dávila a memorandum alleging that after Rivera learned about the interviews of the Fajardo Store employees, she met with Aponte and threatened to retaliate against him as well as the employee that had complained against her via an anonymous text message sent to Eaves.

In an e-mail dated November 29, 2007 Dávila requested a legal opinion from Cameron Rostrón,[17] concerning the risks that a possible dismissal of Rivera would entail. The e-mail mentioned that Rivera lacked management skills when interacting with her team, and that employees had complained about her mood swings, lack of professionalism, poor communication skills and compulsive behavior, yelling and screaming at employees and customers.

On December 4, 2007 Rivera requested a meeting with Dávila. Dávila told her that she was unavailable that day, but that they would meet without delay the following day.

Later that day, Eaves summoned Rivera and Aponte to a meeting to be held on December 7, 2007. In an e-mail sent to both of them, Eaves claimed that the purpose of the meeting was to discuss Rivera and Aponte's handling of their employees in accordance with Sprint's established guidelines.

The following day, on December 5, 2007 at a meeting in Sprint Caribe's headquarters, Rodríguez confronted Rivera with the call to Dávila and told her that he knew about it and in a threatening manner told Rivera that "she never learns." Later that same day, Rivera filed a formal sexual harassment complaint against Rodríguez through Sprint's Ethics Helpline.

Also on that date, Dávila told Rivera that she would not be able to meet with her because she was too busy. On December 6, 2007, Rivera sent an e-mail to Dávila informing her about the grievance she filed via the Ethics Helpline. Dávila replied and Rivera was again summoned to a meeting with her and Eaves to be held on the following day.

On December 7, 2007 Rivera finally met with Eaves and Dávila, as

---

[17] The Court assumes that Rostrón was a lawyer working at Sprint's legal department.

summoned by both of them. At this meeting, the parties discussed Rivera's sexual harassment complaint against Rodríguez, although the parties are in dispute as to the manner in which this discussion was carried out.[18] Rivera also claims that Eaves began shouting at her and in a very hostile manner demanded to know what Rivera "wanted to get out of this". Rivera answered that all she wanted was to work in peace, without sexual harassment or reprisals and that she wanted to return to work in the metropolitan area, since the Fajardo store was far from Rivera's home and sometimes she was working until after 10:00 p.m.

At the meeting, Dávila also asked Rivera to draft a report detailing Rodríguez's alleged acts in order to commence an investigation. Dávila and Eaves also discussed with Rivera the ongoing investigation regarding the Fajardo Store employees complaints against her.

Sprint, as a remedial measure to protect Rivera, transferred the supervision of the Fajardo Store away from Rodríguez to District Manager Ana Franco. Rodríguez also received a verbal "coaching" from Eaves, apparently as a result of Rivera's complaints against him.

On December 13, 2007 Rivera submitted her memorandum about Rodríguez's alleged sexual harassment conduct, and immediately thereafter Sprint allegedly began an investigation regarding Rodríguez alleged misconduct. In her memorandum, Rivera stated that Rodríguez's inappropriate comments began on July 2007, specifically July 3, 2007.

Meanwhile, Sprint continued with its investigation regarding the complaints made by Fajardo Store employees against Rivera, and once such investigation was concluded, a meeting was held on January 10, 2008 between Eaves, Dávila and Rivera. Rivera was under the impression that the meeting would be about her grievance against Rodríguez, as she had previously sent an e-mail to Dávila inquiring about its status, and Dávila had apparently responded by saying that the company would be taking action "soon".

At the meeting, Eaves informed Rivera that the topic of discussion would be the employee complaints filed against her and that she was going to be placed on a Final Warning, which would be active in her personnel file for 12 months. Eaves would also be personally overseeing her

---

[18] At the meeting, Rivera claims Eaves questioned the timing of her grievance against Rodríguez, and demanded to know why she had waited so long to complain.

performance and warned Rivera that she would be fired if Sprint were to receive one more complaint against her. Eaves also refused to say which employees had complained about Rivera, and so she was unable to refute any of the grievances made against her. Rivera then signed the written warning, although she claims to have done so under duress.

Rivera was transferred to the Catalinas Mall Store in Caguas, under the direct supervision of District Manager Franco, effective February 1, 2008.

On February 23, 2008, Eaves received an electronic mail from Sprint customer Mr. Edil Rodríguez complaining against Rivera because she allegedly mistreated his wife at the Catalinas Mall Store to which she had just been transferred.

The other Sprint employee who witnessed the situation, Myrna Ayala, also confirmed Rivera's unprofessional behavior towards Mr. Rodríguez's wife and declared that similar behavior had been displayed by Rivera in a previous situation.

On February 28, 2008 Franco sent Rivera an e-mail stating her intention to work on a corrective action plan with Rivera. Rivera claims this corrective action plan was originally requested by Eaves.

Sprint concluded its investigation about Rodríguez's alleged sexual harassment and determined that the complaint was unsubstantiated and that Rodríguez had not sexually harassed Rivera.

Around this time, Rivera received a call ordering her to report to Sprint Caribe's headquarters to sign an affidavit on behalf of Sprint Caribe in a racial discrimination case filed by Alivette Hernández. She did so on February 29, 2008 and, after signing the affidavit, was told to go to another conference room and wait for Eaves. Eaves then arrived with Franco and informed Rivera that she was terminating Rivera's employment. Eaves told Rivera that she was being fired because Sprint had received another complaint against her (the complaint by Edil Rodríguez and his wife).

The Court will now proceed to outline the applicable standard of review for a motion seeking summary judgment.

## II.  Standard of Review

A motion for summary judgment is governed by Rule 56(c) of the

Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Sands v. Ridlefilm Corp., 212 F.3d 657, 660 (1st Cir. 2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, see DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997), through definite and competent evidence. See Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir. 2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). However, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir.2002). The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000). This is so, because credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge. Id.

### III. Discussion

The following is a discussion of Rivera's claims, in the following manner. First, the Court will discuss her federal law claims under Title VII, namely her hostile work environment and retaliation claims. Afterwards, the Court will discuss Rivera's claims arising under state law, including her claims under Puerto Rico Laws No. 17, 69, 100, 80 and 115.

### A. Title VII Hostile Work Environment

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has interpreted the phrase "terms, conditions, or privileges of employment" as manifesting "a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986) (quoting L.A. Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978)).

Among the discriminatory conducts prohibited by Title VII in the workplace is sexual harassment. See Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Industries v. Ellerth, 524 U.S. 742 (1998) and Oncale v. Sundowner Offshore Services, 523 U.S. 75 (1998). The Equal Employment Opportunity Commission ("EEOC") has clarified that:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such an individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

29 C.F.R. § 1604.11(a).

There exist two general alternative approaches towards proving sex-based employment discrimination under Title VII. The first is quid pro quo harassment, in which "a supervisor uses employer processes to punish a subordinate for refusing to comply with sexual demands." Hernández-Loring

v. Universidad Metropolitana, 233 F.3d 49, 52 (1st Cir. 2000). Such conduct is actionable because it involves explicit and tangible alterations in the terms or conditions of employment. See Ellerth, supra. Secondly, harassment that creates a sexually hostile and abusive work environment is actionable when it is sufficiently severe or pervasive to effect constructive alterations in the terms or conditions of employment. See Lipsett v. University of Puerto Rico, 864 F.2d 881, 897-898 (1st Cir. 1988).

In this case, Rivera alleges in her opposition to Sprint's motion for summary judgment that Rodríguez's conduct constituted a form of harassment that generated a hostile work environment. In determining whether a Title VII hostile work environment claim exists, the Court must look to all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-116 (2002). A hostile work environment claim is based upon the cumulative effect of individual acts that may not by themselves be actionable. Id. The Court also notes that the instances of harassment need not be related in time or type. See Davis v. Monsanto Chemical Co., 858 F.2d 345, 349 (6th Cir. 1988).

To succeed on a hostile work environment claim against Sprint, Rivera must establish six elements: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and that she in fact did perceive it to be so; and (6) that some basis for employer liability has been demonstrated. Agusty-Reyes v. Dep't. of Educ. Of P.R., 601 F.3d 45, 53, n.6 (1st Cir. 2010).

Proceeding to apply this six-element test, there can be no doubt that Rivera is a member of a protected class, as she is a woman. Secondly, Rivera has alleged, and Sprint does not seem to dispute, that the purported sexual harassment was unwelcomed. Rodríguez's first documented

act of harassment allegedly took place in early July 2007, when he apparently ridiculed Rivera on the phone for having a foreign boyfriend. Rivera claims that she felt humiliated as a result of his comments. When Rodríguez visited Rivera's store on August 16, 2007, he again repeated the referenced comments and asked Rivera, using obscene language, to find him a "magician" who would have a one night stand with him and then disappear. Rivera claims that she rebuffed Rodríguez, but that he just laughed it off. The next month, when Rodríguez returned to Rivera's store and showed her a picture of a woman in a white baby doll, and then asked Rivera whether she had any pictures like that or any videos of her having sexual relations, Rivera told him his conduct was unacceptable and that he had to stop. Rivera's response to Rodríguez's comments, coupled with her allegations that she tried to report his conduct to Eaves and Dávila on several occasions, is enough for a reasonable jury to conclude that that Rodríguez's conduct was unwelcome.

     As to the third element, that the harassment was based upon sex, courts have noted that a plaintiff is not required to demonstrate that the harasser's acts were motivated by sexual desire, Oncale, 523 U.S. at 80, but merely that the harassment was gender-specific. Forrest v. Brinker Intern. Payroll Co., 511 F.3d 225, 229 (1st Cir. 2007). Furthermore, the First Circuit has noted that evidence of sexually-charged or salacious behavior is often sufficient, but not necessary, to prove that a work environment was sufficiently hostile or abusive to a female employee to amount to discrimination on the basis of sex. Gorski v. N.H. Dep't of Corrections, 290 F.3d 466, 472 (1st Cir. 2002). Here, a reasonable jury could conclude that Rodríguez's harassment was based upon sex, as his comments were overtly sexual and lascivious in nature, referencing both Rivera and Rodríguez's respective sex lives.

     The fourth element of the test requires Rivera to establish that the harassment was either severe or pervasive. Sprint claims that the comments allegedly made by Rodríguez to Rivera are insufficient to create a severe and pervasive pattern of harassment as they merely constituted three comments occurring over a three month period. The Court disagrees, and notes that the test to be applied is in the disjunctive: the conduct must be sufficiently severe *or* pervasive so as to alter the conditions of employment. Rivera alleges that there were four comments, namely the

following: (1) "Are you crazy? I can't believe you paid to go to Santo Domingo to get a dick without social security!" (made twice to Rivera on two different occasions); (2) "How would you look in one of these slips" (while showing Rivera a picture of a woman in a white "baby doll"); (3) "I am so bored, find me a magician who would fuck me and then disappear to hell;" and (4) Rodríguez allegedly asked Rivera whether she had any videos on her phone depicting her having sexual relations.

Sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)(citing Meritor, 477 U.S. at 65, 67). The Court finds that, were Rivera to convince a jury that the comments were in fact made, the same are sufficiently severe to sustain a colorable claim of harassment under Title VII. Although the comments were spaced out over a three month period, and Rodríguez and Rivera did not work together every day, the comments are so infused with sexual overtones that a reasonable juror could find them sufficiently offensive, humiliating and ridiculing to be classified as "severe" under the six-element test.

Rivera also complains of hostile treatment by Rodríguez that was not overtly related to her gender. She claims that after the third incident, when he showed her the picture on his phone and she chastised him for it, he became irate and proceeded to shout to all of the employees at the store that he was issuing all of them a verbal warning. Also, when Rivera tried to complain to Eaves via phone, it was Rodríguez who returned her phone call and let Rivera know that he counted with Eaves support and asked her why she wanted to talk with Eaves and not with him. Rivera also alleges that Rodríguez threatened her at a restaurant, and expressed disappointment in her for daring to call Eaves. These incidents, along with the supposed comments made by Rodríguez, are enough to allow a reasonable jury to conclude that Rivera's working conditions were materially altered.

As a result, Rodríguez's conduct is both objectively and subjectively offensive; if in fact made, a reasonable person would find his comments to be abusive, and Rivera has stated that she found them to be humiliating. Thus, the fifth element of the test is also met.

The last element of the test, whether there is some basis for employer liability, is more challenging. The First Circuit has outlined the applicable Supreme Court jurisprudence concerning employer liability for a supervisor's alleged harassment in Arrieta-Colón v. Wal-Mart, 434 F.3d 75 (2006), as follows:

(1) "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807.

(2) Where "no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." Id.

(3) "No affirmative defense is available ... when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Id. at 808.

(4) The affirmative defense, when available, "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 807. The employer bears the burden of proof as to both elements. Id. at 807-08.

(5) As to the first element of the defense, proof of an anti-harassment policy with a complaint procedure available to employees, while not necessarily dispositive, is relevant. Id. at 807.

(6) As to the second element of the defense, proof that the employee failed to meet his obligation of using reasonable care is not limited to an unreasonable failure to use such a procedure, although such proof will normally suffice to meet the employer's burden. Id. at 807-08. See also Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 32 (1st Cir. 2003); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 20 (1st Cir. 2002).

At the outset, Rivera claims that Sprint is precluded from raising the Faragher-Ellerth defense as Rodríguez's harassment towards her culminated in a tangible employment action against her, namely her dismissal on February of 2008. The Court disagrees, and as it will explain

infra, it considers Sprint's dismissal of Rivera to be for legitimate and non-discriminatory reasons.

However, Rivera also alleges that around September 2007, following some of the incidents with Rodríguez, the following took place:

> Rodríguez became increasingly hostile to Rivera when she refused to welcome his advances. A few days later, on September 28, 2007 Rodríguez, in retaliation for not accepting his unwelcome sexual advances, transferred her again to the Fajardo store. Rivera became physically ill due to the nervous state Rodríguez put her in and had to call in sick.

See Plaintiff's Counterstatement of Material Facts, ¶ 32, Docket No. 102.

Rivera's transfer may amount to a tangible employment action as Rivera considered it to be an undesirable reassignment, being outside the San Juan Metropolitan Area and still within Rodríguez's jurisdiction. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 44 (1st Cir. 2003)(holding that a reassignment of an employee could constitute a tangible employment action, supporting finding of vicarious liability of employer, particularly if it caused a loss of income, as long as there is a causal link between the reassignment and the alleged harassment and harasser). Although there is no evidence on the record that Rivera's transfer to the Fajardo Store resulted in a loss of income, there is evidence to support a finding that said transfer could be seen as a form of punishment, given all the operational deficiencies present at that location, and it being further away from Rivera's home. Moreover, Rivera claims that on October 5, 2007 she received a phone call from Rodríguez, who told her that Eaves was aware of her transfer to Fajardo and signed off on it. The Court also takes into account that Defendants, in their opposition to plaintiff's counterstatement of material facts, failed to proffer a legitimate reason for Rivera's transfer there, despite her allegation that the same was in retaliation for refusing Rodríguez's advances. Thus, the Court finds that Sprint's assertion of the Faragher-Ellerth defense is inapposite.

In any event, Sprint would face difficulty satisfying the second prong of the Faragher-Ellerth defense. The Court recognizes that Sprint had a comprehensive anti-harassment policy in place, and that Rivera was well aware of its provisions. Nevertheless, Rivera argues that the presence of such policy does not necessarily mean that Sprint followed it. Reading the facts under the light most favorable to her, she did complain

to Ms. Franco (another Retail Sales Manager, the same position Rodríguez held) about Rodríguez's inappropriate comments on August 2007. Ms. Franco allegedly responded to Rivera that Rodríguez's behavior was unacceptable and that she was right in stopping him. The "Employee Complaint and Remedy Procedure" section of Sprint's policy directs victimized employees to report acts of harassment in the following manner:

> Step 1
> Report the incident to your supervisor, the next level of management, a Human Resources representative or to another member of management with whom you are comfortable. If your supervisor or a higher level management employee is the person engaging in the offending behavior, you should report the matter to another member of management or to a Human Resources representative, who will ensure that there will be no retaliation or reprisal against you for reporting the conduct. You may also use the Ethics Helpline.
>
> Step 2
> The individual informed of the occurrence will notify a Human Resources representative so that a comprehensive and confidential investigation may be undertaken.
> ...

See Sprint Policy brochure: "Not Ever!", Docket No. 82-1, Attachment 5.

The Court finds that Sprint is unable to prove by a preponderance of the evidence that Rivera failed to comply with its anti-harassment policy. Rivera's decision to contact Ms. Franco to inform her about Rodríguez's transgressions is within the prescribed procedures, as Ms. Franco was a member of management, equal in hierarchy to Rodríguez. Although the record reveals several inconsistencies in Rivera's story as it relates to the incidents with Rodríguez and when she opposed them, the Court believes such issues are better suited for a jury than for disposition via summary judgment. As such, the Court finds that Rivera has satisfied the sixth element of the test, thereby evincing some basis for employer liability. Sprint may still raise the Faragher-Ellerth defense before the jury, depending on what facts Rivera is able to establish at trial.

Given that Rivera has satisfied the six-element test to support her claim of a hostile work environment under Title VII, the Court **DENIES** Sprint's request for dismissal of such claim.

## B. Title VII Retaliation and Employment Termination

Rivera argues that her termination was a direct result of her opposition to Rodríguez's sexually-infused comments as well as her grievance via the Ethics Helpline, in violation of Title VII's anti-

Civil No. 09-1813 (PG)                                              Page 27

retaliation provision. Sprint retorts that this claim should be dismissed
because Rivera's termination was instead a result of her cantankerous
attitude towards her subordinates and customers.

Title VII makes it an unlawful employment practice for an employer
to discriminate against any of his employees because they have "opposed
any practice made an unlawful employment practice by [Title VII], or
because [they have] made a charge, testified, assisted, or participated in
any manner in an investigation, proceeding or hearing under [Title VII]."
42 U.S.C. § 2000e-3(a).

To make out a prima facie case of retaliation under the familiar
burden-shifting framework articulated in McDonnell Douglas Corp. v. Green,
411 U.S. 792, 801-03 (1973), Rivera must prove that: (1) she engaged in
protected activity under Title VII; (2) she suffered an adverse employment
action; and (3) the adverse employment action was causally connected to
the protected activity. Fantini v. Salem State College, 557 F.3d 22, 32
(1st Cir. 2009); Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39,
46 (1st Cir. 2010)

If Rivera is able to establish a prima facie case of retaliation,
the burden will then shift to Defendants to articulate a legitimate, non-
retaliatory reason for their employment decision. Román v. Potter, 604
F.3d 34, 39 (1st Cir. 2010). If the Defendants meet their burden of
production, "the burden shifts back to [Rivera] to show that the proffered
legitimate reason is in fact a pretext and that the job action was the
result of the defendant's retaliatory animus." Id. (internal quotation
marks and citation omitted).

    i.   *Prima Facie Case*

Sprint does not seem to contest the point that Rivera's grievance
through the Ethics Helpline constituted a protected activity under Title
VII. Also, it is well settled that Rivera suffered an adverse employment
action as a result of her termination. Sprint's argument, rather, focuses
on the lack of causality between her grievance and her subsequent
dismissal. Rivera counters that the close temporal proximity between her
protected activity and her ultimate dismissal is enough to establish a
prima facie case of retaliation. The Court agrees.

The First Circuit has held that the burden of establishing a prima facie case of retaliation is a relatively light one, and that temporal proximity alone can suffice to meet it. See DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008); and Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007) (holding that temporal proximity between June 2002 complaint of discrimination and August 2002 termination was sufficient to make prima facie showing of causation). As Rivera filed her grievance before the Sprint Ethics Helpline on December 7, 2007 and was shortly thereafter discharged on February 29, 2008, temporal proximity between the two events is clear, and thus Rivera has met her burden of establishing a prima facie case of retaliation. Consequently, the Court now proceeds to determine whether Sprint has articulated a legitimate, non-retaliatory reason for its decision to terminate Rivera's employment.

### ii. Sprint's Legitimate, Non-Retaliatory Reason for Discharging Rivera

Sprint argues that Rivera's dismissal was the culmination of a myriad of complaints made against her by her subordinates and customers, for her repeated attitude problems towards them and her lack of tact. In support thereof, Sprint has abounded the record with evidence attesting to the multiple disciplinary measures taken against Rivera, as well as with testimony from fellow employees and complaints by customers against her.

Perusing the record, it becomes clear that Rivera had a long history of employment problems with Sprint. As early as 2002, Sprint began receiving complaints addressing Rivera's behavior. In particular, the first blunder concerned an incident where a customer from a non-profit entity dedicated to assisting handicapped individuals felt mistreated by Rivera when she denied him a replacement phone and told him that she could not waste any more time with him. Action was later taken against Rivera on March, 2004, when she was placed on a six month written warning by Rodríguez, due to the Human Resources Department having received several complaints from her subordinates complaining of mistreatment by her. It is noteworthy that Rivera was only given a written warning after an internal investigation was carried out by Sprint which concluded that employees and customers were not treated in a professional manner by Rivera.

In 2005, when Rivera was first transferred to the Fajardo Store, Dávila received an e-mail from several of the employees there, who mentioned that they felt harassed by Rivera. Another investigation was carried out, which found numerous issues with Rivera's management style and team interactions. As a result, Rivera was subsequently given a final written warning by Rodríguez, but it seemed to be of no avail. Sprint kept receiving complaints from employees, customers and even the security company which provided guards for Sprint's stores, slating Sprint for Rivera's purported acts of mistreatment and her failure to work harmoniously with others.

It seems that wherever Rivera went, the complaints against her followed. In 2007, when Rivera was transferred to the Sprint Store at the Escorial Plaza Shopping Center, employees Raul Franco and Alivette Hernandez filed grievances against Rivera for rude behavior and discrimination. When she was transferred back to the Fajardo store later that year, one of the employees apparently complained anonymously to Eaves about Rivera's conduct. Rivera allegedly threatened to retaliate against said employee as well as against Assistant Store Manager Aponte, who put the incident in writing via a memorandum sent to both Eaves and Dávila.

As a result of the Fajardo Store complaints against Rivera, Sprint conducted an investigation and Rivera was subsequently given a final written warning by Eaves, who warned her that she was not going to tolerate any further unprofessional behavior. The Final Warning document also warned Rivera that she would be terminated in the event of any future violations. The final straw came in late February 2008, when Eaves received an e-mail from a customer who complained that Rivera mistreated his wife. Sprint interviewed the wife and confirmed that Rivera had indeed acted inappropriately. Based on this new complaint against Rivera, Sprint finally terminated her employment on February 29, 2008.

It is simply beyond a doubt that Sprint had a legitimate, nondiscriminatory reason for discharging Rivera, as she exhibited numerous behavioral problems which she ultimately failed to correct. Sprint claims that her rude and inimical conduct constituted a violation of Sprint's Customer Satisfaction Policy and Ethics Code, and upon reviewing the record as a whole, the Court determines that this assessment is indeed reasonable. Accordingly, it needs go no further in assessing the merits of

Sprint's decision against Rivera. See Furnco Const. Corp. v. Waters, 438 U.S. 567, 578 (1978); and Mesnick v. General Electric Co., 950 F.2d 816, 825 (1st Cir. 1991)("Courts may not sit as super personnel departments, assessing the merits-or even the rationality-of employers' nondiscriminatory business decisions").

As Sprint has provided a legitimate, non-discriminatory reason for terminating Rivera's employment, her prima facie inference of retaliation crumbles, and she must now establish that Sprint's motives were pretextual. Medina-Muñoz, 896 F.2d at 9.

### iii. Pretext

In evaluating Rivera's claim of pretext, the Court must "weigh all the circumstantial evidence of discrimination, including the strength of the plaintiff's prima facie case and the employer's proffered reasons for its action, mindful that everything depends on individual facts." Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 7 (1st Cir. 2000)(internal quotation marks omitted).

While Rivera is correct that temporal proximity may give rise to a suggestion of retaliation, that suggestion is not necessarily conclusive. An employee ultimately bears the burden of showing pretext, sufficient to survive summary judgment. See Hodgens v. General Dynamics Corp., 144 F.3d 151, 170 (1st Cir. 1998). Here, the circumstantial fact of temporal proximity is weakened considerably by Rivera's history of crude behavior and the multiple disciplinary measures that Sprint took against her. It is pertinent to note that Sprint began to receive complaints about Rivera from as early as 2002, five years before Rodríguez started uttering the alleged lewd comments to Rivera. While several of the warnings present in her file were issued by her alleged harasser, Sprint has propped up the record with abundant evidence reflecting that such actions were justified. Furthermore, Sprint has provided an internal company e-mail dated November 27, 2007 evincing that it was already considering firing Rivera for her behavior before she filed her grievance via the Ethics Helpline. Accordingly, the Court finds that in the instant case temporal proximity alone is not probative of retaliation by Sprint.

Another avenue for Rivera to show pretext is through "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and [with or without the additional evidence and inferences properly drawn therefrom] infer that the employer did not act for the asserted non-discriminatory reasons." Billings v. Town of Grafton, 515 F.3d 39, 55-56 (1st Cir. 2008).

Rivera attempts to do so by claiming that Eaves and Dávila proffered contradicting reasons for terminating her employment. She maintains that on February 29, 2008, when she was dismissed, Eaves told her that it was due to her alleged mistreatment of a customer's wife. Later, Rivera argues Eaves changed her story and claimed that she was dismissed for having mistreated an employee. In support of her assertion, Rivera cites to deposition testimony from Eaves where she allegedly stumbled and switched stories. However, upon review of the deposition's transcript, it becomes clear that Eaves testified that she took into account both incidents in her decision to dismiss Rivera. Thus, Rivera's attempt to demonstrate pretext through Eaves' testimony fails.

Next, Rivera engages in a broad reaching attack challenging the credibility of the complaints made against her, classifying them as frivolous and fabricated by Sprint to protect Rodríguez and justify her dismissal. In weighing whether her allegations are sufficient to establish a finding of pretext, the Court notes that the issue is not whether Sprint's reasons to fire Rivera were real, but merely whether the decisionmakers-Eaves and Dávila—reasonably believed them to be real. Mulero-Rodríguez, 98 F.3d at 674. In this case, Sprint's proffered reasons for terminating Rivera find ample support on the record, via deposition testimony, affidavits and records of interviews of Sprint employees who worked with Rivera. Moreover, much of the evidence present in the record is the product of investigations carried out by Sprint which determined that Rivera had indeed mistreated employees and customers. Rivera has countered this overwhelming evidence by challenging the veracity of many of the statements made by her fellow employees and customers against her, but she has provided little evidence that Eaves and Dávila did not actually find them to be truthful. Other than her self-serving assertions present in an unsworn statement executed after the filing of Sprint's motion for summary judgment, the record is entirely devoid of evidence

supporting Rivera's claim of fabrication. See Medina-Muñoz, 896 F.2d at 8 (Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is compelled if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation); and Román, 604 F.3d at 40 (Courts need not credit inferences that rely on tenuous insinuation).

Accordingly, the Court finds that Rivera has not met her burden in establishing pretext, and thus her retaliation claim stemming from her dismissal must be **DISMISSED** with **PREJUDICE.** However, inasmuch as Rivera has made a plausible claim of retaliation arising from her transfer to Fajardo in 2007, and given that Sprint has not addressed this claim, the same is left undisturbed by this opinion and order.

### C. State Law Claims

#### i.   Laws No. 100, 69 and 17

In its motion for summary judgment, Sprint invites the Court to dismiss the state law claims advanced by Rivera. As the Court has only partially dismissed Rivera's claims under federal law, it declines Sprint's request and only dismisses these claims in part, as outlined below.

Laws No. 100, 69 and 17 serve "virtually identical purposes and outlaw virtually identical behaviors." Miró Martínez v. Blanco Vélez Store, Inc., 393 F.Supp.2d 108, 114 (D.P.R. 2005). Law 100 prohibits general discrimination in the workplace by reason of age, race, color, sex, social or national origin, social status, and political or religious beliefs. Delgado Zayas v. Hosp. Int. Med. Avanzada, 137 P.R. Dec. 643 (1994). The Supreme Court of Puerto Rico has held that sexual harassment constitutes a kind of sexual discrimination shunned by Law 100. Id.

Law 17 and Law 69 represent more specific prohibitions on conduct already proscribed by Law 100 and all three statutes form a single legislative scheme to further the public policy against gender discrimination. See Suárez Ruiz v. Figueroa Colón, 145 P.R. Dec 142, 148-49 (1998). Law 69, on its part, specifically prohibits discrimination on the basis of gender, and this Court has held that this prohibition overlaps with Law 17's specific prohibition against sexual harassment in the workplace. Miró Martínez, 393 F.Supp.2d at 114. Courts have also held

that Law 17 conforms to the hostile work environment requirements of Title VII. See García v. V. Suárez & Co., 288 F.Supp.2d 148, 161 (D.P.R. 2003); and Afanador Irizarry v. Roger Electric Co., Inc., 2002 TSPR 56, 156 D.P.R. 651. The statute holds employers accountable for their own acts of sexual harassment and for those of their agents or supervisors, regardless of whether the acts that gave rise to the claim were authorized or prohibited by the employers. Id.

In the present case, Rivera's Title VII hostile work environment claim survives Sprint's motion for summary judgment. Consequently, the Court concludes that her hostile work environment-based claims under Laws 17, 69, and 100 also withstand summary disposition. The Court, therefore, **DENIES** Sprint's motion for summary judgment on Rivera's hostile work environment claim under Puerto Rico law.

Conversely, Rivera's state law retaliation claims stemming from her dismissal do not withstand summary judgment. Law 17 protects an employee against retaliatory action by an employer due to an employee's participation in the lodging or investigation of a sexual harassment complaint. See P.R. LAWS ANN. tit. 29, § 155h; Campos-Orrego v. Rivera, 175 F.3d 89, 95, n.5 (1st Cir. 1999); Matos Ortiz v. Puerto Rico, 103 F.Supp.2d 59, 63 (D.P.R. 2000) (noting Law 17 supports sexual harassment and retaliation claims). Law 69 makes it unlawful for an employer "to dismiss or discriminate against any employee or participant who files a complaint or charge, or is opposed to discriminatory practices, or participates in an investigation or suit for discriminatory practices against the employer." P.R. LAWS ANN. tit. 29, § 1340; Rivera v. Johnson & Johnson, 436 F.Supp.2d 316, 326 (D.P.R. 2006). In this case, the Court concluded that Rivera was unable to create a triable issue surrounding the pretext element of her retaliation claim under Title VII, stemming from her dismissal from Sprint. Likewise, her analogous claims under Puerto Rico law must also be **DISMISSED** with **PREJUDICE.**

However, her claim of retaliation due to her transfer to the Fajardo Store survives summary disposition. As such, the analogous claims under Puerto Rico Laws No. 69 and 17 survive summary judgment as well.

Accordingly, the Court **GRANTS** in part and **DENIES** in part Sprint's request to dismiss Rivera's claims under Laws 100, 69 and 17.

     *ii.   **Law 80***

Law 80 provides a remedy in the event of employee termination without just cause. See Hoyos v. Telecorp Communications, Inc., 488 F.3d 1, 6 (1st Cir. 2007); Álvarez-Fonseca v. Pepsi Cola of P.R. Bottling, Co., 152 F.3d 17, 28 (1st Cir. 1998). Under Law 80, once an employee proves that he or she was discharged and alleges that his or her dismissal was unjustified, his or her employer must establish by a preponderance of the evidence that the discharge was for good cause. Good cause may include an employee's improper and disorderly conduct, negligent attitudes toward her work, and violations of the employer's policies. Id. The employer bears the ultimate burden to prove that it had just cause to terminate the employee. See P.R. LAWS ANN. tit. 29, § 185k; Álvarez-Fonseca, 152 F.3d at 28.

In this case, Sprint was able to establish a legitimate, non-discriminatory reason for terminating Rivera's employment. Rivera was not able to create a triable issue of fact regarding whether the multiple disciplinary measures taken against her were a pretext designed to mask Sprint's retaliatory animus. Sprint has therefore demonstrated just cause under Law 80. Consequently, Rivera's claims arising therefrom are hereby **DISMISSED** with **PREJUDICE.**

### iii. Law 115

Law 115 states that an employer may not "discharge, threaten, or discriminate against an employee regarding the terms, conditions, compensation, location, benefits or privileges of the employment should the employee offer or attempt to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico." P.R. LAWS. ANN. tit. 29, § 194a(a).

Rivera has failed to produce any evidence that she offered or attempted to offer testimony or information either to a legislative, administrative or judicial forum in Puerto Rico, before her dismissal. Hence, Sprint is entitled to summary judgment on Rivera's Law 115 claims, which are hereby **DISMISSED** with **PREJUDICE.**

## IV.   Conclusion

For the reasons expounded above, the Court reaches the following conclusions. First, Sprint's motion for summary judgment as to Rivera's

Civil No. 09-1813 (PG)                                            Page 35

hostile work environment claims under Title VII and related Puerto Rico laws is **DENIED.** Second, Sprint's request for summary judgment as to Rivera's claim of retaliation stemming from her dismissal under Title VII and related Puerto Rico laws is **GRANTED.** However, said request is **DENIED** as it concerns Rivera's claim of retaliation arising from her transfer to Fajardo, under both Title VII and related Puerto Rico laws. Lastly, Rivera's claims under both Law 80 and Law 115 are **DISMISSED** with **PREJUDICE.**

      **IT IS SO ORDERED.**

      In San Juan, Puerto Rico, January 5, 2012.


                      *s/ Juan M. Pérez-Giménez*
                      **JUAN M. PEREZ-GIMENEZ**
                      **SENIOR U.S. DISTRICT JUDGE**